[761 NYS2d 245]

RITA DWORKIN, Appellant, v EITAN DOMBROWSKI, Doing Business as PALACE HOME FOR ADULTS, Respondent. (Action No. 1.)

MARC GYORI, Appellant, et al., Plaintiff, v EITAN DOMBROWSKI, Doing Business as PALACE HOME FOR ADULTS, Respondent. (Action No. 2.)

Second Department, June 2, 2003

APPEARANCES OF COUNSEL

*Jeffrey Seigel*, Islandia (*Joseph Gatto* of counsel), for appellants.

### OPINION OF THE COURT

PRUDENTI, P.J.

Recipients of federal supplemental security income (hereinafter SSI) benefits who are in "residential care" are entitled to a "monthly personal allowance" (Social Services Law § 131-*o* [1]; § 2 [21]; § 208 [1], [2]; § 209 [1] [b]; 18 NYCRR 398.2, 845.12 [a]). Section 131-*o* (2) of the Social Services Law states, among other things, that "[a] facility shall not demand, require or contract for payment of all or any part of the personal allowance in satisfaction of the facility rate for supplies and services." We hold that the defendant residential care facility owner improperly charged the appellant residents a fee that they could not satisfy except, in effect, by recourse to all or part of their respective "monthly personal allowances." Accordingly, the Supreme Court erred in granting summary judgment to the defendant and denying summary judgment to the appellants on the issue of liability. Therefore, we modify the order appealed from, and remit for a hearing on the issue of the proper amount of compensatory and punitive damages to be awarded to the appellants in accordance with section 131-*o* (3) of the Social Services Law.

PLAINTIFF DWORKIN

From July 25, 1989, until December 2000, Rita Dworkin, the plaintiff in Action No. 1, was a resident of the Palace Home for

Adults, which is owned and operated by the defendant Eitan Dombrowski. She asserts that her only sources of income are SSI benefits and Social Security disability insurance (hereinafter SSD) benefits. In her complaint, Dworkin alleged that she never received her "personal needs allowance" and that the defendant required her "to negotiate her full monthly income as payment for services at the Palace Home for Adults." She claimed, inter alia, that she sustained damages as a result of the defendant's violation of Social Services Law § 131-*o* (2) and intentional misappropriation of her "monthly needs allowance."

After issue was joined, Dworkin moved for summary judgment in Action No. 1 asserting, among other things, that "[t]he Palace charged me so much for the basic room and board rate that I was denied the entire amount of my personal needs allowance from 1994 through 1999, and was denied part of my allowance in 2000." Dworkin also asserted that her benefit checks were deposited into a bank account from which her brother-in-law had authority to draw checks to the order of the defendant to pay her expenses. She stated that, beginning in the year 2000, after she threatened to sue the defendant, her charges were reduced so as to leave her with between $58 and $122 per month, amounts that, she claimed, did not equal her full entitlement. She acknowledged that her brother-in-law occasionally provided her with about $35 when she told him she needed money.

PLAINTIFF GYORI

From October 15, 1991, until December 2000, Marc Gyori, a plaintiff in Action No. 2, was also a resident of the Palace Home for Adults. He claims that his only sources of income are SSI benefits, Social Security retirement benefits, and a Veterans Administration pension. In the complaint in Action No. 2, Gyori alleged, among other things, that the defendant "intentionally prevented his receipt of his monthly personal needs allowance" and that he incurred damages as a result of the defendant's intentional misappropriation of his personal needs allowance and violation of Social Services Law § 131-*o* (2).

Gyori also moved for summary judgment asserting, among other things, "that [the defendant] charged me so much in satisfaction of the Palace's basic services room and board rate that I was denied my full personal needs allowance in almost every month I lived at the Palace until January 2000." Gyori also stated that his benefit checks were deposited in a bank account from which his cousin had authority to pay expenses,

and that his cousin made the payments to the defendant until November 1996; thereafter, Gyori paid the defendant himself. Gyori also asserted that for the years 1994 through 1999 the defendant required him to pay, for room and board, various sums that left him with less than the amount to which he was entitled as his "monthly personal allowance." Moreover, it was not until the year 2000 that the defendant reduced the amount being charged for monthly room and board to an amount that, for the first time, left a remainder that was equivalent to what Gyori alleged is the full amount of his "personal monthly allowance."

Gyori's motion was supported by a report of the New York State Department of Health, dated September 25, 2000. According to this report, the defendant or his agents had, on various occasions, engaged in conduct that deprived various residents of their monthly personal allowances. Among other things, the defendant accepted monthly fees that were excessive to the extent that they diminished or eliminated the monthly personal allowance to which the various residents were entitled under applicable state regulations.

DEFENDANT'S CROSS MOTIONS

The defendant separately cross-moved, inter alia, for summary judgment dismissing the complaint in Action No. 1 and dismissing the complaint insofar as asserted by Gyori in Action No. 2. The defendant submitted similar affidavits in support of these cross motions, and in opposition to the appellants' motions. In his affidavits, the defendant admitted that he was doing business as the Palace Home for Adults until February 1, 2001, but stated that he "never received, at any time, [either appellant's] personal allowance benefits."

With respect to Dworkin, the defendant asserted that her brother-in-law was "designated [as her] representative [and was] to attend to her financial matters and [to] be the named payee of [her] personal allowance." The defendant emphasized that Dworkin's brother-in-law, on Dworkin's behalf, did not authorize the defendant to establish a "facility-maintained personal account." He observed that Dworkin's SSI and SSD benefits were deposited directly into an account under her brother-in-law's control, and that her brother-in-law paid the defendant's monthly charges out of that account.

Similarly, with respect to Gyori, the defendant asserted that Gyori's cousin also declined offers to have the defendant establish a "facility personal allowance account." Thus, the defendant "never received [and did not] know the amount of personal

allowance funds received by Gyori and his representative, as said payments were also mailed to Gyori and his [cousin]." The defendant asserted that, until November 1998, he did not know that Gyori received SSI benefits and that Gyori and his cousin "agreed to pay the established monthly charges from their own maintained bank account by personal checks drawn on said bank accounts."

REPLY

In reply to the defendant's assertion that he did not know that Gyori received SSI benefits, counsel stated, among other things, that the defendant "should have known about Gyori's SSI." He argued that the defendant had an obligation to assist Gyori in determining potential sources of income (*see e.g.* 18 NYCRR 487.7 [g] [1] [vi]) and that he was thus on "constructive notice" of Gyori's receipt of SSI benefits.

ORDER APPEALED FROM

By order dated December 13, 2001, and entered in both actions, the Supreme Court denied the motions and granted those branches of the cross motions which were for summary judgment dismissing the complaint in Action No. 1 and the complaint insofar as asserted by Gyori in Action No. 2. The court reasoned, "It is * * * beyond dispute that [the appellants] voluntarily elected not to maintain personal allowance accounts at [the defendant's] facility. Therefore, there can be no real claim that he withheld funds due [the appellants]." The Supreme Court concluded that the governing statutes did not impose an obligation on the defendant to reduce its fee for basic services when it did not receive the resident's SSI benefits directly from the State, and that it would be an "expansion" of the statute for the court to impose such an obligation.

We disagree, and find that the governing statutes unambiguously impose upon the defendant an affirmative obligation to charge the appellants a monthly fee for basic services that is no greater than the difference between (a) the "monthly personal allowance" specified in Social Services Law § 131-*o* (1) (b), as possibly increased by operation of Social Services Law § 131-*o* (7) in conjunction with various state and federal regulations, and (b) the monthly amount received for SSI benefits and other "additional state payments" (*see* Social Services Law § 208 [2]) as defined in the applicable statutes and regulations. The statutes unambiguously state that the monthly personal allowance must come "out of" the SSI benefits. Moreover, the defendant is in no position to claim ignorance as to what either such sum actually is for any particular month, or to claim

ignorance as to what the maximum monthly amount he may lawfully charge for his facility's services therefore should be.

ANALYSIS

Section 131-*o* (1) of the Social Services Law states, in part: "Each individual receiving * * * residential care * * * and who is receiving benefits under the program of additional state payments pursuant to this chapter while receiving such care, shall be entitled to a monthly personal allowance out of such benefits in [defined] amount[s]."

Pursuant to Social Services Law § 131-*o* (7), the operators of residential facilities must treat certain additional income that might be received by a resident as the equivalent of the "personal allowance," as defined in Social Services Law § 131-*o* (1). Federal statutes and regulations governing SSI benefits provide, in general, that the first $20 per month of an individual's unearned income is not considered in determining such individual's eligibility for SSI benefits (*see* 42 USC § 1382a [b] [2]; 20 CFR 416.1124 [c] [12]). For the purpose of applying these rules, the term "unearned income" includes, for example, disability benefits and veterans benefits (*see* 20 CFR 416.1121 [a]). In accordance with these regulations, the appellants assert, and it is not disputed, that their monthly personal allowances are $20 per month higher than the sums defined in Social Services Law § 131-*o* (1) (*see Kupferman v New York State Bd. of Social Welfare,* 66 AD2d 540, 542-543 [1979]; *Andrews v Mensch,* 100 Misc 2d 79, 81-82 [1979]).

The appellants assert, and it is not contradicted, that the monthly personal allowance due to each of them under previous versions of the statutes noted above, applicable in calendar years 1994 through 2000, were as follows:

1994: $100 per month plus $20 per month = $120
1995: $103 per month plus $20 per month = $123
1996: $106 per month plus $20 per month = $126
1997: $109 per month plus $20 per month = $129
1998: $111 per month plus $20 per month = $131
1999: $112 per month plus $20 per month = $132
2000: $115 per month plus $20 per month = $135.

Additionally, section 131-*o* (2) of the Social Services Law states, in part:

> "*A facility shall not demand, require or contract for payment of all or any part of the personal allowance in satisfaction of the facility rate for supplies*

*and services* and shall not charge the individual or the account for any supplies or services that the facility is by law, regulation or agreement with the individual required to provide or for any medical supplies or services for which payment is available under medical assistance, pursuant to this title, medicare pursuant to title XVIII of the federal social security act, or any third party coverage" (emphasis added).

The italicized portion of section 131-*o* (2) of the Social Services Law is echoed in the regulations (*see* 18 NYCRR 485.12 [a] [4]).

Section 131-*o* (3) of the Social Services Law states, in part:

*"Any individual who has not received or been able to control personal allowance funds to the extent and in the manner required by this section may maintain an action* in his own behalf *for recovery of any such funds,* and upon a showing that the funds were intentionally misappropriated or withheld to other than the intended use, for recovery of additional punitive damages in an amount equal to twice the amount misappropriated or withheld" (emphasis added).

The foregoing provisions, creating a private right of action for both compensatory and punitive damages, are echoed in the applicable regulations (*see* 18 NYCRR 485.12 [a] [5]).

The Legislature also provided for a criminal penalty in Social Services Law § 131-*o* (9) (a) and (b), which state:

"(a) *any person* who intentionally withholds a resident's personal allowance or *who demands*, beneficially receives, *or contracts for payment of all or any part of a resident's personal allowance in satisfaction of the facility rate* for supplies and services shall be guilty of a class A misdemeanor;

"(b) any person who commingles, borrows from or pledges any personal allowance funds required to be held in a separate account shall be guilty of a class A misdemeanor" (emphasis added).

These criminal penalties are also authorized by the corresponding regulations (*see* 18 NYCRR 485.12 [a] [8]).

The appellants, as recipients of SSI and as residents of the State of New York, are presumed to meet the requirements set

forth in Social Services Law § 209 (1) (a), and are thus presumed to have no assets or income that would disqualify them from receipt of SSI benefits (*see* Social Services Law § 208 [6], [9]; § 209 [1] [a] [ii], [iii]).

The plain language of the statutes noted above should be the first, and in the absence of any ambiguity, essentially the only point of reference in assessing the Legislature's intent. From the statutory language quoted above, the intent of the Legislature is quite clear: To provide those institutionalized individuals who are so totally devoid of personal assets as to be completely dependent on SSI or "additional state payments" programs with a modest guaranteed monthly stipend over and above the aggregate of the monthly sum needed to pay for essential services.

Irrespective of whether, for the convenience of particular residents, such stipend is held for their benefit in an account maintained by the facility as a kind of trust, the minimum monthly amount of such stipend is to be available "for the residents' exclusive use in purchasing basic personal items" (*Empire State Assn. of Adult Homes v Perales,* 139 AD2d 41, 42 [1988]; *see Kupferman v New York State Bd. of Social Welfare, supra* at 541-542). New York policy in this respect conforms to federal mandates that such residents receive an allowance "reasonable in amount for clothing and other personal needs" (42 USC § 1396a [q] [1] [A] [i]; *see Friedman v Berger,* 547 F2d 724, 731 n 15 [1976]). "[A]dult home operators are prohibited from using any portion of these personal allowance funds to compensate them[selves] for services provided" (*Empire State Assn. of Adult Homes v Perales, supra* at 42; *see Kupferman v New York State Bd. of Social Welfare, supra* at 541-542). "This law [Social Services Law § 131-*o*] represents an attempt by the Legislature to make bearable the living conditions of those individuals who have virtually been stripped of their dignity by institutionalization" (*Andrews v Mensch, supra* at 84).

In accordance with the plain language of the statute, as it was in effect between 1994 and 2000, any individual who was receiving SSI, who was also receiving residential care, and who was hence eligible for the monthly personal allowance, was entitled to receive between $120 and $135 for each month, and the operator of the residence in question was expressly forbidden from "demand[ing] [or] requir[ing] * * * payment of all or any part of the personal allowance in satisfaction of the facility rate for supplies and services" (Social Services Law § 131-*o* [2]). This was merely another way of requiring the operator of

such a facility to charge those of its residents who were entitled to such monthly personal allowance a monthly fee for services and supplies that was no greater than the difference between (a) the defined statutory sum (between $120 and $135 from 1994 through 2000) and (b) whatever higher amount such resident receives from government sources that constitute "additional state payments," that is, from what are presumably the only sources of revenue available to the resident. The statute guarantees that a certain class of indigent and institutionalized individuals would have unrestrained access to a relatively small amount of cash per month (e.g. $135 per month in calendar year 2000). This goal was achieved through the indirect method of requiring the operator of the facility in question to charge, again using the calendar year 2000 as an example, a monthly fee that was $135 less than the sum total of each such individual's "additional state payments."

The Supreme Court essentially concluded that, because the defendant never actually possessed any of the monthly sums due to the plaintiffs as their monthly personal allowances, he could not be held liable in an action at law based on his having allegedly withheld such sums. We disagree. Social Services Law § 131-o (2) does not merely prohibit the defendant from withholding the monthly sums to which certain residents are entitled as their monthly allowances out of their SSI benefits; rather, it prohibited him from contracting with them for their payment for supplies and services in such a way as to give rise to an obligation on their part to expend part or all of their personal allowance to pay for services or supplies.

According to the statute, "a facility shall not demand, require or contract for payment of all or any part of the personal allowance in satisfaction of the facility rate for supplies and services" (Social Services Law § 131-o [2]). This prohibition exists independent of whether the individual resident in question exercises the option to have the facility safeguard his or her monthly personal allowance in a form of escrow or trust account managed by the facility, as opposed to his or her retaining direct control over that money in a personal bank account, or in one maintained by a representative on such resident's behalf. In fact, the regulations state that a facility operator "must not require a resident to maintain a personal allowance account at the facility" (18 NYCRR 488.6 [c] [13]). The regulations also provide that a resident may terminate such an account at any time (see 18 NYCRR 488.6 [c] [15]). The regulations thus recognize the right of residents to receive such

monthly allowances and to retain them in their own bank accounts, rather than in the escrow account maintained by the facility. Nothing in the statutes or regulations suggests that those residents who exercise their right in this respect do so at the risk of having their monthly allowance diminished, if not totally eliminated.

There is an issue of fact as to whether the defendant acted intentionally in overcharging the plaintiffs in these two cases in violation of Social Services Law § 131-o (2). However, this issue of fact relates to his potential liability for punitive damages only. It does not affect the appellants' respective rights to compensatory damages, that is, to a judgment in a sum reflecting the extent to which, as a result of overcharges, they were deprived of the use and benefit of the monthly personal allowances to which they were absolutely entitled as a matter of law. There is also an issue of fact as to the proper measure of compensatory damages.

For the foregoing reasons, we conclude that the appellants' motions should have been granted solely to the extent of granting summary judgment on the issue of liability, determining that the defendant violated section 131-o (2) of the Social Services Law. The submissions do not permit summary resolution as to the appropriate measure of compensatory damages, or as to the availability of punitive damages, pursuant to section 131-o (3) of the Social Services Law. The branches of the defendant's separate cross motions which were for summary judgment should have been denied in their entirety. Accordingly, we modify the order by deleting the provision thereof granting those branches of the separate cross motions which were for summary judgment dismissing the complaint in Action No. 1 and dismissing the complaint in Action No. 2 insofar as asserted by the plaintiff Marc Gyori and substituting therefor a provision denying those branches of the separate cross motions and by deleting the provision thereof denying those branches of the separate motions which were for summary judgment on the issue of liability for compensatory damages and substituting therefor a provision granting those branches of the motions, reinstate the complaints in Action Nos. 1 and 2 insofar as asserted by the plaintiff Marc Gyori, and remit the matter to the Supreme Court, Nassau County, for a trial on the issue of the damages to be awarded under section 131-o (3) of the Social Services Law.

SMITH, J.P., McGINITY and COZIER, JJ., concur.

ORDERED that the order is modified, on the law, (1) by deleting the provision granting those branches of the separate cross

motions which were for summary judgment, respectively, dismissing the complaint in Action No. 1 and dismissing the complaint in Action No. 2 insofar as asserted by the plaintiff Marc Gyori, and substituting therefor a provision denying those branches of the separate cross motions, and (2) by deleting the provision thereof denying those branches of the separate motions which were for summary judgment on the issue of liability for compensatory damages and substituting therefor a provision granting those branches of the motions; as so modified, the order is affirmed, with one bill of costs to the appellants, the complaint in Action No. 1 and the complaint in Action No. 2 insofar as asserted by the plaintiff Marc Gyori are reinstated, and the matter is remitted to the Supreme Court, Nassau County, for a trial on the issue of the damages to be awarded under section 131-*o* (3) of the Social Services Law.